IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-CV-23352-MGC

RAY MOHAMED, individually and on behalf of all
others similarly situated,

       Plaintiff

vs.

AMERICAN MOTOR COMPANY, LLC,
a Florida limited liability company, d/b/a
"InstantCarOffer.com" and "ICO"; and
OFF LEASE ONLY, INC., a Florida Corporation,

      Defendants.

---

**DEFENDANT OFF LEASE ONLY, INC.'S OPPOSITION TO CLASS CERTIFICATION**

Respectfully submitted,

By:   /s/ Franklin Zemel_____
Franklin L. Zemel
Florida Bar No. 816620
Alan R. Poppe
Florida Bar No. 0186872
**ARNSTEIN & LEHR LLP**
200 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida 33301
Telephone: (954) 713-7600
Email: franklin.zemel@arnstein.com
Email: apoppe@arsntein.com

and

Ejola Cook, Esq.
Rebecca Radosevich, Esq.
**OFF LEASE ONLY, INC.**
776 Lake Worth Blvd.
Lake Worth, Florida 33460
Telephone: (561) 222-2277
Email: court@offleaseonly.com
    ejolac@offleaseonly.com

*Attorneys for Off Lease Only, Inc.*

# I.   INTRODUCTION

In this putative class action, brought pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA"), Plaintiff seeks certification of a class of persons who are alleged to have **received** a text message from Former-Party, American Motor Company, LLC d/b/a instantcaroffer.com (hereafter "ICO"), offering to purchase their used car or truck listed for sale on Craigslist.org.  It is undisputed that Defendant, Off Lease Only, Inc. ("Off Lease"), never **sent** a *single one* of the text messages that form the basis for this putative class action.  Off Lease's liability, as alleged by Plaintiff, is exclusively premised upon vicarious liability.

In support of class certification, Plaintiff has filed a Motion that despite being 30 pages in length and citing to hundreds of pages of exhibits, lacks substance in lieu of boilerplate assertions.  Nearly the entire first half of the Motion is dedicated to discussing the background of the TCPA and irrelevancies such as the alleged use of text messaging by the automotive industry and the certification of other TCPA class actions, as if by some collective "guilt" of the car industry Plaintiff suggests this action should also be certified.  We will address these issues further below, but we also point out that this matter presents two TCPA class-wide issues of first impression in this Circuit, the resolution of either one in favor of Off Lease is case-dispositive.

The first such issue concerns whether, by posting their telephone number in a Craigslist ad advertising their used vehicle for sale, Plaintiff and the putative class provided their prior express consent to receive a text message from ICO (not Off Lease) offering to buy that particular vehicle.  In its Order on Standing [D.E. 212], the Court noted the importance of the specific language each advertiser used in his or her Craigslist ad – namely, whether the advertiser stated "do not text me."  Thus, individualized inquiries would be needed to determine whether or not each class member included such limiting language in his or her Craigslist advertisement.

<u>Second,</u> Plaintiff has presented no evidence as part of this Motion that any putative class members actually *received* a text message. In his Motion, the Plaintiff relies entirely upon records (the admissibility of which is highly doubtful) showing that a purported text message was "*sent*," which contradicts the class definition sought by Plaintiff in both his Complaint and in his Motion. More importantly, however, for a class member to have suffered a concrete and particularized injury and therefore have Article III standing and, further, to meet Rule 23's requirements of "commonality" and "predominance," the class member must have actually "*received*" a text. If this Court were to certify a class without evidence that a class member actually received a text message, the Court would be forced to engage in tens of thousands of individualized factual inquiries to determine whether a class member did, in fact, receive an offending text message from ICO.

Plaintiff's lack of evidence that a text message was actually received also means the class is not ascertainable as there are no objective criteria in the record from which the Court can ascertain the class members' identities. For these, and many other reasons discussed below, including the lack of typicality and Plaintiff's inadequacy as a class representative, this case is not proper for class certification. Plaintiff's Motion should, therefore, be denied.

## II.    FACTS RELEVANT TO CLASS CERTIFICATION

### The Parties

Plaintiff owns and operates an automotive repair business known as Shift Transmissions, Inc. d/b/a A-AAA-A Nationwide Transmission located in Miami, Florida. (Transcript of Deposition of Ray Mohamed ("Mohamed Dep."), at 12:23-14:1, relevant portions of which are attached hereto as EXHIBIT "A"). In addition to repairing cars, Plaintiff offers for sale and/or has sold used automobiles. (Ex. A, Mohamed Dep., at 15:21-16:19).

Off Lease buys used motor vehicles and then sells them both online and at physical locations located in Central and South Florida.  (Declaration of Ejola Cook ("Cook Decl."), ¶ 2, a true and correct copy of which is attached hereto as **Exhibit "B"**; Deposition Transcript of Mark Fischer ("Fischer Dep."), at 12:25-13:5, relevant portions of which are attached hereto as **Exhibit "C"**).

ICO is the owner, creator, and operator of a website known as www.instantcaroffer.com, which provides instant cash offers to purchase consumers' cars and trucks upon their electronic submission of a questionnaire concerning the vehicle (e.g., make, model, year, condition, etc.) (Declaration of Thomas "Kip" Rowe (Rowe Decl."), ¶¶ 3-4, a true and correct copy of which is attached hereto as **Exhibit "D"**).   While ICO made offers to purchase vehicles through its website, www.instantcaroffer.com, ICO itself does <u>not</u> purchase any vehicles.  (Ex. D, Rowe Decl., ¶ 9).  In order to close the sale of each ICO instant offer, and in lieu of purchasing vehicles, ICO contracts with automobile dealerships throughout the United States to provide a network of dealers who provide ICO's customers with a "quick, hassle-free outlet" by which they can sell their vehicles.  (*Id.*, ¶ 9).

***The Dealer Agreement between ICO and Off Lease.***

Around March of 2014, ICO and Off Lease were introduced and ICO inquired whether Off Lease would be interested in joining ICO's network of dealers.  (Ex. D, Rowe Decl., ¶ 12; Ex. C, Fischer Dep., at 66:14-67:1).   After a test-run period, Off Lease executed a Dealer Agreement on May 7, 2014 (the "Dealer Agreement"), a copy of which is attached hereto as **Exhibit  "E"**; Ex. B, Cook Decl., ¶ 4 & Ex. 1 attached thereto; Ex. D, Rowe Decl., ¶ 13).  The Dealer Agreement set forth the terms and conditions of the relationship between ICO and Off

Lease.  (Ex. B, Cook Decl., ¶ 4; Ex. D, Rowe Decl., ¶ 13).  The Dealer Agreement was in effect for less than one year, from May 7, 2014, to March 1, 2015.  (D.E. 213-1, ¶ 4).

***ICO, and ICO alone, controlled the means and methods by which it sent its text messages.***

ICO solely controlled the means and methods by which it drove customer traffic to its Website.  (Ex. D, Rowe Decl., ¶ 19).  ICO contracted with a company called Liberty Metrics, which purportedly obtained the numbers from internet postings by individuals seeking to sell their vehicles, including the website Craigslist, and who provided their numbers to be contacted regarding their respective vehicles for sale.  (*Id.*, ¶ 20; ICO's Answers to Plaintiff's Interrogatory Nos. 8 & 9 at p. 5, a true and correct copy of which is attached hereto as EXHIBIT "F").  Off Lease never communicated with Liberty Metrics, nor was Off Lease even aware of the company. (Ex. B, Cook Decl., ¶7; Ex. D, Rowe Decl., ¶ 20).

Using the numbers obtained from Liberty Metrics, ICO would sort and compile the numbers into a list that ICO would then upload into a web portal used to communicate with various messaging platforms, including Twilio, Callfire, and 3Seventy.  (Ex. D, Rowe Decl., ¶ 21; Ex. F, ICO's Answers to Plaintiff's Interrogatory Nos. 9 & 12).   ICO, *and ICO alone*, contracted with these entities on its own, and solely directed and controlled the entities through which the text messages were sent.  (Ex. B, Cook Decl., ¶ 8; Ex. D, Rowe Decl., ¶ 21).  Off Lease never communicated with nor was it even aware of the existence of 3Seventy Mobile, Twilio, or CallFire.  (Ex. B, Cook Decl., ¶ 8; Ex. D, Rowe Decl., ¶ 21).  And, ICO was responsible for creating the language of the text message sent.  (Ex. B, Cook Decl., ¶9).

***Plaintiff's Craigslist Ads Offering Used Cars for Sale.***

On multiple occasions since 2011, Plaintiff has offered for sale and/or sold used automobiles.  (Ex. A, Mohamed Dep., at 15:21-16:19).   In every instance in which Plaintiff

offered a used car for sale, he advertised the vehicle for sale on the website Craigslist.com.  (*Id.*, at 18:1-19:6; 27:9-38:23; First Am. Compl., ¶ 27).   In each of those Craigslist ads, Plaintiff provided his cellular telephone number, 786-XXX-0174, for interested third parties to contact regarding the used car listed for sale.[1]  (*Id.*, at 19:12-17, 37:20-38:23; D.E. 20, First Am. Compl., ¶ 27).   Plaintiff testified at his deposition that, when he placed the advertisements on Craigslist, he specifically ***wanted third parties to contact him*** on his cellular telephone number and offer to purchase his used car for sale.  (*Id.*, at 19:7-21).   During the material times, Plaintiff's data plan included unlimited texting.  (*Id.*, 9:10-11:16).

While Plaintiff alleged in his First Amended Complaint that, "without exception," he placed ads in Craigslist stating "please do not text me" [D.E. 20, First Am. Compl., ¶¶ 27-28], the evidence ***contradicts*** this assertion.  Contrary to Plaintiff's claim, many of Plaintiff's 2014 Craigslist ads do <u>not</u> contain any "no texting" limitation.  (Ex. A, Mohamed Dep., at 98:14-104:10; True and correct copies of certain of Plaintiff's  Craigslist ads attached hereto as **EXHIBIT "G"**).   For example, shortly before Plaintiff received a January 2015 text message he complains of in this action, Plaintiff placed ads on Craigslist for a Cadillac Escalade and a Chevrolet 1500 pick-up that did <u>not</u> contain any "no texting" language. (Ex. G, Plaintiff's Craigslist ads).

Plaintiff's "no texting" admonition is apparently unique among his fellow Craigslist advertisers and putative class members.  In a sample of actual ads that were "scraped" from Craigslist by Liberty Metrics and produced in this litigation by ICO, only ***ten*** of approximately 880 ads explicitly state "do not text me" like certain of Plaintiff's ads do.  (Declaration of Jeff Stafford ("Stafford Decl."), ¶ 14, a true and copy of which is attached hereto as **EXHIBIT "H"**;

---

[1] Plaintiff also listed his used cars for sale on Facebook, Instagram and placed classified advertisements on the website rodsandclassics.com.  (Ex. A, Mohamed Dep., at 18:5-7, 20:10-24:8).

and Exhibit 1 to Stafford Decl., Craigslist Spreadsheet).  In contrast, *__239__* of the 880 ads expressly state "please text," "text ok," or something similar.  (*Id.*).  The remaining 627 Craigslist ads do not mention texting one way or another, but provide a contact telephone number.  (*Id.*).

***ICO's text messages to Plaintiff.***

Plaintiff complains that he allegedly received three text messages on October 15, 2014, January 16, 2015, and April 9, 2015.  (D.E. 213, Mot., p. 11, n.27; Ex. A., Mohamed Dep., at 53:13-57:25).  Each of the text messages included a hyperlink that directed Plaintiff to ICO's website, (not Off Lease) where he could choose to input basic information regarding his used car for sale, including make, model, year, and condition, at which time he would then receive an instant cash offer to purchase the vehicle. (D.E. 20, Am. Compl., ¶¶ 29-30).

Prior to the October 15, 2014 text message, Plaintiff engaged in a text messaging "conversation" with ICO regarding a used car Plaintiff had listed for sale on Craigslist at that time.  (Ex A., Mohamed Dep., at 77:18-88:16).  Plaintiff concedes that this texting conversation was with a "real" person and not a computer system or automated dialer and therefore not within the scope of this lawsuit.  (*Id.* at 81:20-23, 83:13-15). After supplying ICO with information regarding the used car for sale, Plaintiff received a monetary offer from ICO to purchase the car. (*Id.,* at 83:20-22). Plaintiff rejected the offer as being too low.  (*Id.* at 85:10-86:6).

Following his text message conversation with ICO in March 2014, Plaintiff received the October 15, 2014 text he now complains of, which asked Plaintiff: "Is your car still available?" (*Id.* at 86:7-10).  In his deposition, Plaintiff *__conceded__* that the October 10th email was clearly sent to inquire about the car he had been previously discussing with ICO and was, under the circumstances, sent by a "live" person and __not__ an automated telephone dialing system and is therefore outside the scope of this lawsuit.  (*Id.* at 86:11-87:1).

After the October 10, 2014 text exchange, Plaintiff, once again, listed additional cars for sale on Craigslist.  (*Id.*, at 88:17-22).  In response to these "new" classified ads, ICO (not Off Lease) sent the next two text messages that Plaintiff complains of in this action on January 16, 2015, and April 9, 2015.  (D.E. 213, Mot., p. 11, n.27).  The April 9, 2015 text message was sent by ICO ***after*** the Dealer Agreement was terminated [D.E. 213-4, ¶ 4], and therefore, not only is Plaintiff's claim with respect to the April 9, 2015 text outside the scope of any purported agency, but the class period must be appropriately accounted for as well.

***ICO's text messages to the putative class.***

Plaintiff rests his entire basis for class certification, including upon an Excel Spreadsheet produced by ICO in this litigation, bates labeled "Mohamed-AMC000630 OLO_ALL_TEXTS.csv." (D.E. 213-2, Exhibit 2 to Motion).  The Excel Spreadsheet was created by Thomas "Kip" Rowe of ICO by downloading information from a non-party, Twilio, who, in turn, imported the information into an Excel program and created the spreadsheet.  (Ex. D, Rowe Decl., ¶ 24).  Mr. Rowe does not know how Twilio compiled this information.  (*Id.*).  The Excel Spreadsheet shows the phone number that a text was supposedly ***sent*** from, the phone number the text was supposedly ***sent*** to, the time it was supposedly sent, and the language used in the text message.  (*Id.*).  The document does <u>not</u> contain any information evidencing whether a text message was ***received*** or whether the alleged recipient "opened" the text message on his or her device or otherwise viewed the message.  (*Id.*).  Similarly, the document does not indicate whether a text was sent to a cell number, or a landline, or other device not capable of receiving a text message, or whether the number was even operational or not.

Mr. Rowe, who was solely responsible for sending the text messages on behalf of ICO, attested that, to his understating, <u>none</u> of the texting platforms used by ICO, Twilio, Callfire, or

3Seventy, had the ability to confirm that a text message actually reached the recipient's device, i.e., whether it was "*__received__*." (*Id.*, ¶ 23). Rather, according to Mr. Rowe's understanding, the platforms could only tell ICO that a text message was *__sent__*.[2] (*Id.*).

***Plaintiff's Purported Injury***

In his Complaint, Plaintiff fails to allege that he suffered ***any*** injury at all. Similarly, Plaintiff's Motion lacks even a general assertion of injury as a result of receiving the text messages from ICO. In his Brief on Standing, Plaintiff, for the first and only time, identified "invasion of privacy, intrusion upon his cellular phone, waste of time, and nuisance" as "harms" he allegedly suffered as a result of the text messages. (D.E. 175, Brief, p. 5). At his deposition, however, Plaintiff described his cause of action as being "about me getting texts where they're making me ridiculous offers." (Ex. A, Mohamed Dep., at 29:15-16; 30:3-6). In short, Plaintiff's real complaint about the text messages is that ICO's offer was lower than what he wanted. (*Id.*, at 85:24-86:6). Plaintiff insisted that he did not want offers from "businesses" because, in his words, he assumed they would "low-ball" him. (*Id.*, at 49:20-50:20). But, Plaintiff conceded he would accept an offer from a "business" if it was a "reasonable" offer. (*Id.*, at 50:13-20).

## II. Legal Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The party seeking class certification "must affirmatively demonstrate his [or her] compliance with the Rule [23]." *Id.* Class certification is proper only if, after a ***"rigorous analysis,"*** the trial court determines both the class representative and the putative class meet each

---

[2] Twlio's website indicates that if a message is marked "Sent" (or even if it is marked "Delivered") in Twilio's logs, the text may not have actually been received by the intended recipient for a myriad of reasons, including whether the number can receive text messages, whether the phone had reception, or whether the message was blocked. *See* https://support.twilio.com/hc/en-us/articles/223181868-Troubleshooting-undelivered-Twilio-SMS-messages.

of the requirements specified in Rule 23(a), as well as at least one of the requirements set forth in Rule 23(b). *See id.* at 350-51 (emphasis added); s*ee also Vega v. T–Mobile USA, Inc.,* 564 F.3d 1256, 1266 (11th Cir. 2009). This "rigorous analysis" frequently entails some overlap with the merits of the plaintiff's underlying claim. *See Dukes,* 564 U.S. at 351. If a question of fact or law is relevant to determining whether the Rule 23 prerequisites for class certification have been satisfied, "then the district court has a duty to actually decide it and not accept it as true or construe it in anyone's favor." *Brown v. Electrolux Home Products, Inc*., 817 F.3d 1225, 1234 (11th Cir. 2016) (citations omitted).

As noted, class action certification requires that the putative class meets each of the four factors under Rule 23(a), and at least one of the requirements of Rule 23(b). *See* Fed. R. Civ. P. 23(b). In addition, "[a] plaintiff seeking certification of a claim for class treatment must propose an adequately defined class that satisfies the requirements of Rule 23." *Abby v. Paige*, 282 F.R.D. 576, 578 (S.D.Fla.2012) (citing *Kelecseny v. Chevron, U.S.A., Inc.,* 262 F.R.D. 660, 667 (S.D.Fla.2009)). Under Rule 23(a), a putative class may be certified <u>only</u> if:

    (1)     the class is so numerous that joinder of all members is impracticable;

    (2)     there are questions of law or fact common to the class;

    (3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4)     the representative parties will fairly and adequately protect the interests of the class.

*See* Fed. R. Civ. P. 23(a). Here, Plaintiff seeks certification pursuant to Rule 23(b)(3), where the court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23 does not merely set forth a pleading standard; a movant must "affirmatively demonstrate his [or her]

compliance with the Rule – that is, he [or she] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 564 U.S. at 350.

"The burden of proof to establish the propriety of class certification rests with the advocate of the class." *See also Electrolux,* 817 F.3d at 1233. "All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Id.* at 1233. If a court has doubts about whether the requirements of Rule 23 have been met, the court should refuse certification. *See id.* at 1233-34.

The TCPA prohibits "any person . . . to make any call (other than a call for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular service." 47 U.S.C. § 227 (b)(1). The "prior express consent" of the call (or, in this case, text) recipient is an affirmative defense on which the defendant has the ultimate burden of proof. *See Murphy v. DCI Biologicals Orlando, LLC,* No. 6:12-cv-1459-Orl-36 KRS, 2013 WL 6865772, at *4 (M.D. Fla. Dec. 31, 2013). However, for purposes of the class certification in TCPA cases, it has been deemed "irrelevant" as to who has the burden of proof on this defense as ultimately, "consent is an issue that would have to be determined on an *individual basis* at trial." *Hicks v. Client Servs. Inc.*, No. 07-61822-CIV, 2008 WL 5479111, at *8 (S.D. Fla. Dec. 11, 2008) (emphasis added). Further, it is the plaintiff's burden to establish the Rule 23 factors – including that individual issues will not predominate. *See Balthazor v. Cent. Credit Servs., Inc.,* No. 10-62435-CIV, 2012 WL 6725872, at *4 (S.D. Fla. Dec. 27, 2012). As explained below, Plaintiff has failed to meet his heavy burden and therefore, class certification should be <u>denied</u>.

A.     **ABSENT CLASS MEMBERS MUST HAVE ARTICLE III STANDING**.

As a threshold matter, this case should not be certified because the proposed class definition includes individuals who have <u>not</u> suffered a "concrete" legal injury sufficient to

convey Article III standing.   In accordance with the "irreducible constitutional minimum of standing," several Circuits have held that absent class members – like all litigants in federal court – must have Article III standing.  *See Denney v. Deutsche Bank AG,* 443 F. 3d 253, 264 (2d Cir. 2006) (holding that "no class may be certified that contains members lacking Article III standing" and therefore, "[t]he class must . . . be defined in such a way that anyone within it would have standing"); *Avritt v. Reliastar Life Ins. Co.,* 615 F.3d 1023, 1034 (8th Cir. 2010) ("[A] named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves.").  *See also Mazza v. Am. Honda Motor*, 666 F.3d 581, 594 (9th Cir. 2012).  While the Court suggested in its Order on Standing [D.E. 212] that the Eleventh Circuit held that absent class members can lack standing, it appears that the Circuit has ***not*** yet definitely ruled on the issue.  *See Randolph v. J.M. Smucker Co.,* 303 F.R.D. 679, 691 (S.D. Fla. 2014) (noting the Eleventh Circuit "has not directly tackled the issue of whether a plaintiff must demonstrate that putative class members have Article III standing at the class certification stage").[3]   Moreover, even those Circuits that have held to the contrary have noted that "a class should not be certified if it is apparent that it contains a *great many persons who have suffered no injury* at the hands of the defendant if only because of the *in terrorem* character of a class action."[4]  *Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 677-78 (7th Cir. 2009) (emphasis added).

While the  Supreme Court has yet to definitely decide  the class-wide standing issue, in its recent decision in *Tyson Foods, Inc. v. Bouphakeo*, 136 S. Ct. 1036, 1050 (2016), the Court

---

[3]  In fact, at least one district court in Florida has cited *Denney* with favor, noting that "[n]o class may be certified that contains members lacking Article III standing." *Dykes v. Dudek*, No. 4:11-cv-116, 2011 WL 4904407, at *2 (N.D. Fla. Oct. 14, 2011) (citing Denney, 443 F. 3d at 264).  *See also Conigliaro v. Norwegian Cruise Line Ltd.,* No. 05-cv-21584, 2006 WL 7346844, at *3 (S.D. Fla. Sept. 1, 2006) ("[T]he proposed class description 'must not be so broad as to include individuals who are without standing to maintain the action on their own behalf'").

[4]  The Third and Seventh Circuits have held that only the named plaintiff needs to establish Article III standing.  *See Kohen*, 571 F.3d at 676; *In Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 306-307 (3d Cir. 1998).

granted *certiorari* in a case raising a similar question, but it ultimately declined to answer "the question [of] whether uninjured class members may recover," despite noting that it was an issue "of great importance."   Chief Justice Roberts, writing separately and joined by Justice Alito, nonetheless stated that because "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not… . if there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand."   *Id.* at 1053. During the same session in which the Supreme Court expressed its concerns regarding "uninjured" class members in *Tyson Foods*, the Court also decided *Spokeo, Inc. v. Robbins,* 136 S. Ct. 1540, 1550 (2016), which held that "Article III standing requires a concrete injury even in the context of a statutory violation" and that "a bare procedural violation" alone does not meet the injury-in-fact requirement.  Especially in light of *Tyson* and *Spokeo*, this Court should follow the reasoning of Second and Eighth Circuits and require that not only must the named plaintiff have suffered a concrete and particularized injury, but so too must ***all class members***.

In the instant case, Plaintiff has defined his proposed class as individuals who "received a text message."  (D.E. 213, Mot., p. 2).  In so doing, Plaintiff asks this court to ***assume*** that mere receipt of the text message is sufficient to constitute a "concrete" injury.  It is not.  In accordance with the requirements of *Spokeo*, the Court has previously determined that Plaintiff suffered a "particularized" injury because he allegedly "personally received" a text message and, further, that he suffered a "concrete" injury to the extent he identified "invasion of privacy, nuisance, and trespass on his cellular phone" as harms ***unique to the Plaintiff*** that were allegedly suffered as a result of the text messages.  (D.E. 212, p. 3).  Similarly, the class must be defined as those persons who (a) personally received a text message (a "particularized" injury) and (b) as a consequence of receipt, suffered either an invasion of privacy, nuisance, or trespass upon their

cellular phone (a "concrete" injury).  As presently defined, the proposed class definition omits the critical requirement of a "concrete" injury and sweeps in persons who have suffered no injury and would not themselves have Article III standing.[5]

## B.   INDIVIDUALIZED   ISSUES   RENDER   CLASS   CERTIFICATION INAPPROPRIATE.

Under the Rule 23(a)(2) "commonality" requirement, "a class action must involve issues that are susceptible to class-wide proof." *Murray v. Auslander,* 244 F.3d 807, 811 (11th Cir. 2001).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the *same injury*," which "does *not* mean merely that they have all suffered a violation of the *same provision of law*." *Dukes*, 564 U.S. at 350.  Instead, the "claims must depend upon a common contention," and "must be of such a nature that it is capable of class-wide resolution – which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims *in one stroke*." *Id.*  As explained by the Supreme Court, "[w]hat matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.*

Though similar to commonality under Rule 23(a)(2), the predominance requirement of Rule 23(b)(3) is "far more demanding." *See Hicks. v. Client Services, Inc.,* No. 07-61822, 2008 WL 5479111, at *5 (S.D. Fla. Dec. 11, 2008).  Rule 23(b)(3) is satisfied when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."  In considering the "predominance" requirement, a court must review the substantive elements of the parties' respective claims, defenses, along with the

---

[5] As explained *infra*, Plaintiff has no evidence to even establish the first prong, item (a) – receipt of text message – for the class members.  Without common proof that each of the putative class members actually **_received_** a text message, Plaintiff does not even get to the second prong, item (b) – "concrete injury" of nuisance, invasion of privacy, or trespass.

relevant facts, and applicable law, and "assess the degree to which resolution of the class-wide issues will further each individual class member's claim against the defendant." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004) (citation omitted). In essence, predominance is concerned with whether the named plaintiff can, through proof of his or her individualized case, offer proof on class-wide basis. *See id.*

Here Plaintiff attempts to establish commonality by proposing there are <u>three</u> common questions: (1) "whether the equipment used to transmit the text messages satisfies the definition of an ATDS as set forth in 47 U.S.C. § 227(a)"; (2) whether Off Lease "can be held vicariously liable for the allegedly violative text messages"; and (3) whether "the Class members provided prior express consent." (D.E. 213, Mot., p. 17). Plaintiff's second and third proposed questions, as drafted, are generalized, "bottom-line liability" questions that do not present common legal or factual questions. Further, as discussed below, Plaintiff's second and third proposed common questions are also fatally flawed because each question cannot be answered in a single trial on behalf of all class members. Plaintiff also omits discussion of other critical and material issues in this case that would necessitate individualized factual inquires precluding class certification.

### 1. *Plaintiff's proposed common "questions" are insufficient under Rule 23(a)(2).*

Plaintiff's proposed second and third common questions are generalized, "bottom line liability" questions that run afoul of the Supreme Court's holding in *Dukes.* In that case, the Supreme Court cautioned that merely reciting generalized "common" questions is not sufficient to meet the requirements of Rule 23(a)(2), since "'any competently crafted class complaint literally raises common questions.'" *Dukes,* 564 U.S. at 349. *See also Espejo,* 2016 WL 6037625, at *9 (merely asking whether all class members suffered a violation of the same provision of law is a "superficial" common question that is "not enough" under *Dukes*). *See also*

*Shamblin v. Obama for America, Inc.,* No. 8:13-cv-2428, 2015 WL 1909765, at *6 (M.D. Fla. April 27, 2015) (noting that Supreme Court Supreme Court "specifically reject[ed] the use of generalized questions to establish commonality").

For example, in *Esperjo*, the court rejected the following proposed common question: "whether [the defendant's] standardized conduct resulted in in an injury that entitles each Class Member to statutory damages under the TCPA." *Esperjo,* 2016 WL 6037625, at *9. In virtually identical fashion, Plaintiff's second and third common questions, ask (i) whether Off Lease "can be held vicariously liable for the allegedly violative text messages" and (ii) whether "the Class members provided prior express consent." These so-called "common" questions do nothing but pose the same superficial "bottom line" liability questions that have been deemed insufficient under *Dukes*.[6]

### 2.    *Numerous individualized factual inquiries would overwhelm this class action.*

#### a.    Apparent authority cannot be determined absent individualized inquiry.

Plaintiff maintains that vicarious liability can be determined on a class-wide basis because Off Lease's "vicarious liability pertains to the relationship between Off Lease Only and [ICO]." (D.E. 213, Mot., pp.19-20). While that may be so with regard to Plaintiff's theory of an actual agency relationship between Off Lease and ICO, Plaintiff's claim of an apparent agency relationship raises individualized issues concerning each of the putative class members. Plaintiff makes no argument – let alone proffers evidence – as to how apparent authority could be established on a class-wide basis.

As explained in our Motion for Summary Judgment [D.E. 224], apparent authority is based on statements or actions by the alleged *principal to the third party*. "Apparent authority is

---

[6] Contrast with, for example, a question asking "whether the class members included the language 'do not text me' or other limiting language in their Craigslist advertisements so as to have not expressly consented to receive a text message from ICO."

the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  Restatement (Third) of Agency § 2.03 (emphasis added).  A belief that results solely from the statements or other conduct of the ***agent,*** unsupported by any manifestations traceable to the principal, does <u>not</u> create apparent authority."  Restatement (Third) of Agency § 2.03 cmt. c. (emphasis added).  Thus, Plaintiff must prove what each text recipient reasonably believed and *relied* upon based on a representation made by *Off Lease*, bearing in mind ICO, not Off Lease, sent the texts.  This would undoubtedly involve many individualized questions, and no way for Off Lease to test such assertions, which Plaintiff asks this Court to simply assume.  In light of the fact the representation must be traceable to Off Lease, Plaintiff cannot simply rely upon the fact that Off Lease's name appeared (without authorization) in <u>*ICO's*</u> text messages.  *See, e.g., Krakauer v. DISH Network*, LLC, 311 F.R.D. 384, 396 (M.D.N.C. 2015) (stating, in a TCPA class action, that unlike actual agency, apparent authority would likely involve individual questions).  Even more to the point, the fact that apparent authority cannot be established on a class-wide basis is shown by Plaintiff's own testimony who conceded in his deposition that he ***<u>never</u>*** communicated either directly or indirectly with Off Lease.[7]  (Ex. A., Mohamed Dep., at 77:11-13; 106:12-107:14; 110:1-24)..

> b.  <u>Individual issues regarding "prior express consent" preclude class certification.</u>

Plaintiff's third proposed common question – "whether Defendants can establish the Class members provided prior express consent" – fares no better.   (D.E. 213, Mot., pp. 13-14).  When a recipient's prior express consent is at issue, the courts in this District have routinely

---

[7] This may also render Plaintiff atypical of putative class members under Rule 23(a)(3).

denied class certification because the question of consent needs to be determined ***individually*** as to each putative class member.[8]   Plaintiff's argument that "consent" is a common question because ICO allegedly obtained the class members' cellular phone numbers from a *single source* is misplaced.   The critical question concerning "consent" is not whether there is only one "source" of the telephone numbers, but rather, what is the "nature" of that single source and does it resolve the issue of consent "***in one stroke***" – as instructed by the Supreme Court in *Dukes*.

In the instant case, ICO allegedly obtained the telephone numbers from Liberty Metrics, which used automated technology to "scrape" the phone numbers from Craigslist ads.   In stark contrast to the cases Plaintiff cites regarding a "single source," the content of those Craigslist ads raises individualized issues regarding the advertiser's "consent" to be contacted regarding the vehicles they listed for sale.   The importance of the language employed in the Craigslist ads and the question of whether Plaintiff or any member of the putative class consented to receive an offer via text message from ICO was specifically discussed by the Court in its March 22, 2017 Order on Standing.   (D.E. 212, Order, p. 5).   In that Order, the Court stated that, despite posting his vehicle for sale on Craigslist, "Plaintiff did not expressly consent" to be contacted by ICO because his Craigslist advertisement "specifically warned third parties not to contact him with

---

[8] *See Fitzhenry v. ADT Corp.*, No. 14-80180, 2014 WL 6663379, at *7 (S.D. Fla. Nov. 3, 2014) (denying class certification in TCPA where individual issues existed as to whether the call recipients had an established business relationship with the defendants);   *Balthazor v. Central Credit Servs., Inc.*, No. 10–62435, 2012 WL 6725872, at *4 (S.D. Fla. Dec. 27, 2012) (denying class certification of TCPA case under commonality and predominance prongs of Rule 23 because "[r]esolution of each putative class member's claim would necessarily involve an individual assessment of whether each class member consented to receive telephone calls on their cellular telephone numbers");   *Hicks v. Client Servs., Inc.*, No. 07–61822, 2008 WL 5479111, at *8 (S.D. Fla. Dec. 11, 2008) (denying class certification in TCPA case because "consent is an issue that would have to be determined on an individual basis at trial").   *See also Shamblin*, 2015 WL 1909765, at *7 (declaring that "there can never be common answers to the question[] of . . . whether the subscriber consented to be called");   *Espejo*, 2016 WL 6037625, at 10 (denying class certification and noting that "individualized consent issues have led other courts to deny class certification of TCPA claims");   *Barrett v. ADT Corp.*, No. 2:15-cv-1348, 2016 WL 865672, at *8 (S.D. Ohio March 7, 2016) (concluding that "mini-trials" to ascertain which call recipients gave prior consent to contact rendered class certification inappropriate).

unsolicited services or offers" and "not to text Plaintiff at all."  (*Id.*).

The Court determined that Off Lease's reliance on the case of *Mey v. Pep-Boys—Manny, Moe & Jack*, 717 S.E.2d 235, (W. Va. 2011), which held that a plaintiff had given his prior express consent to be contacted by listing his used car for sale on Craigslist, was "misplaced," distinguishing that case by relying upon the specific language Plaintiff allegedly used in his Craigslist ads: "[w]hile that case also involved an automobile advertisement via Craigslist, the posting did not include the limiting language that was present in Plaintiff's advertisement." (D.E. 212, Order, p. 5).  *A fortiori,* the crux of this Court's standing determination rests upon the specific "anti-text" language utilized by Plaintiff to conclude he did not provide his express consent to receive ICO's text message.

While the Court indicated that it derived its understanding of Plaintiff's Craigslist advertising from "materials of record," when all of the facts are considered as presented in this Opposition, it is respectfully submitted the record evidence paints an entirely different picture.  It is true that Plaintiff has alleged that, "*without exception*," he placed ads in Craigslist stating "please do not text me." (D.E. 20, First Am. Compl., ¶¶ 27-28).  However, many of the Craigslist ads Plaintiff placed in 2014 do <u>not</u> contain any "no texting" limiting language, including several ads placed in or about the time Plaintiff allegedly received a January 2015 text – a fact Plaintiff conceded in his deposition.  (Ex. G, Plaintiff's Craigslist ads; Ex. A, Mohamed Dep., at 98:14-104:10).   While Plaintiff would no doubt cite his ad for a Toyota Tacoma X-Runner that stated "do not text me," he also placed ads at or about the same time for a Cadillac Escalade and Chevrolet 1500 pick-up that did not contain any "no texting" language. (Ex. G). And, Plaintiff cannot establish whether the text message he received from ICO was in response to either.

Even more significant for purposes of class certification, ICO has produced a spreadsheet consisting of a sample of actual ads that were "scraped" from Craigslist by Liberty Metrics. (Ex. H, Stafford Decl., Ex. 1 attached thereto ). Of the approximately 875 ads on the spreadsheet, only **ten** ads explicitly state "do not text me" or contain similar limiting language. (*Id.*, ¶ 14 & Ex. 1 attached thereto). On the other hand, **239** of the 875 ads affirmatively provided consent to receive text messages, expressly stating "please text," "text ok," or something similar. (*Id.*). This leaves roughly 627 ads that do not mention texting one way or another, but provide a contact telephone number. (*Id.*). While this "sample" is presumably a fraction of the Craigslist ads "scraped" by Liberty Metrics, these 880 ads, taken into consideration with the variations in Plaintiff's own advertising, it plainly shows that the issue of consent is individualized and cannot be established on a class-wide basis "in one stroke." *See, e.g., Dukes,* 564 U.S. at 350.

Based on the Court's statements in its Order on Standing, whether a text recipient provided his or her prior express consent depends upon the language used in each *individual's* own Craigslist ad. And, what of the Craigslist advertisers who did not mention texting at all, but provided a contact telephone number? In short, the Court must make a factual determination on a an individual-by-individual basis as to whether each class member consented to be contacted regarding their vehicles listed for sale *i.e.,* whether a putative class member included the phrase "do not text me" in his or her respective online advertisements.

In addition, the Court will need to engage in individualized fact-finding to determine whether the Craigslist advertiser checked off "the box" to include the phrase "no unsolicited services of offers" in the advertisement.[9] Further, the ambiguity of the phrase "unsolicited"

---

[9] Plaintiff's alleged warning to third parties not to contact him with "unsolicited services or offers" appears when a Craigslist advertiser checks a box on the advertising form. The language merely seeks to prevent third parties from contacting the advertiser regarding matters *other* than the sale of his or her vehicle. The plain meaning of "unsolicited" is "not asked for," "uninvited," or "unrequested." By

would necessarily require the Court to engage in fact-finding to determine what each putative class member considered to be an "unsolicited" service or offer they did not wish to receive by text. Plaintiff clearly cannot testify as to the meaning of "unsolicited" for each and every class member. To complicate matters further, in cases where the putative class member placed more than one Craigslist ad, the Court would need to undertake individualized fact-finding to determine _which_ Craigslist ad ICO was responding to with a text message and whether that particular advertisement included the appropriate limiting language approved by the Court. Due process requires that Off Lease be allowed the opportunity to present every defense available, including the defense of "consent." _See Dukes,_ 564 U.S. at 367 (holding that a "class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims."). Where, as here, the putative class members' consent cannot be resolved on a class-wide basis, individualized issues bar certification.

### 2. Plaintiff has _not_ shown that each putative class member suffered the same injury or any injury at all.

Another individualized issue ignored by Plaintiff is whether the putative class members suffered the **same** injury or, for that matter, _any injury at all_. Commonality does not mean merely that the putative class members suffered the **same violation** of law, but rather, "requires the plaintiff to demonstrate that the class members 'have suffered the **same injury**.'" _Dukes_, 564 U.S. at 349-50. In its recent decision in _Spokeo_, 126 S. Ct. at 1547, the Supreme Court made clear that a statutory violation alone does not eliminate Article III's requirement that a plaintiff prove a "concrete injury." The Supreme Court explained that while "Congress is well positioned

---

responding to Plaintiff's Craigslist ad and making an offer to purchase the vehicle Plaintiff was advertising for sale, ICO was not making an "unsolicited offer," but was simply accepting Plaintiff's invitation to be contacted regarding his vehicle for sale. For purposes of class certification, the Court need not determine, as a matter of law, whether ICO's text message was "unsolicited." Instead, as explained _infra_, whether the phrase was included in any one putative class member's Craigslist ad, would entail individualized fact-finding that precludes a finding of commonality or predominance.

to identify intangible harms that meet minimum Article III requirements," a plaintiff "does not automatically satisfy the injury-in-fact requirement whenever a statute grants a right and purports to authorize a suit to vindicate it." *Id.* at 1549. The Court went on to hold that "a bare procedural violation, divorced from any concrete harm," does not satisfy the injury-in-fact requirement. *Id.*

Following *Spokeo*, several district courts addressing TCPA claims have reasoned that when a party has <u>not</u> actually *received* the alleged violative communication in question, there can be <u>no</u> concrete injury. *See Juarez v. Citibank, N.A.,* No. 16-cv-01984, 2016 WL 4547914, at *3 (N.D. Cal. Sept. 1, 2016) (noting that "calls made to a neglected phone that go unnoticed or calls that are dropped before they connect may violate the TCPA but not cause any concrete injury"); *Romero v. Department Stores National Bank,* No. 15-cv-193, 2016 WL 4184099, at *3-4 (S.D. Cal. Aug. 5, 2016) (stating that "[a] plaintiff cannot have suffered an injury in fact as a result of a phone call she did not know was made"). While *Spokeo* addressed Article III's standing requirement, the Supreme Court's emphasis on plaintiffs demonstrating a concrete harm means that courts should not certify classes that include people who did not suffer any injury – intangible or otherwise.[10] Indeed, in its Order on Standing, the Court noted that while it found the Plaintiff to have Article III standing, "disputes about the putative class are best reserved for

---

[10] In S*pokeo*, the plaintiff sued under the Fair Credit Reporting Act ("FCRA"), alleging that the defendant published factually inaccurate personal information about him. At oral argument, Justice Kagan recognized that establishing whether the information is "inaccurate" for purposes of a "concrete and particularized injury" will make it much more difficult to show that common issues predominate, as required by Rule 23, and asked counsel for the plaintiff the following:

> You said you – you need for the information to be inaccurate to have standing here. **That is going to mean that the class, as you've defined it, is <u>*not going to be certified*</u>.** And I think that that's the right answer, but I just want to make sure that we're on the – we're on the same page here.

(Transcript of Oral Argument, at 45:5-12, a true and correct copy of which is attached hereto as **EXHIBIT "I"**) (emphasis added).

specific class certification proceedings in this case."  (D.E. 212, Order, p. 5).

In his Motion for Class Certification, Plaintiff discusses the general background of the TCPA, noting that in enacting the statute, Congress found that "automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient."  (D.E. 213, Mot., p. 3).  In his Brief on Standing, Plaintiff identified "invasion of privacy, intrusion upon his cellular phone, waste of time, and nuisance" as "harms" he allegedly suffered as a result of the text messages he supposedly received from ICO.  (D.E. 175, Brief, p. 5).  However, to incur a "tangible" harm of cost, or to suffer "intangible" harms of nuisance, invasion of privacy, intrusion upon one's cell phone, or waste of time, one must have actually **_received_** a text in the first place.

In support of certification, however, Plaintiff relies entirely upon inadmissible hearsay and authorized unauthenticated information from ICO that ICO in-turn received from others, which states that a text message was "**_sent_**" and does <u>not</u> establish whether any particular text message was "**_received_**."  Attached to this Opposition is the Declaration of Thomas "Kip" Rowe, a co-owner of ICO and the creator the business concept known as "instantcaroffer.com."  (Ex. D, Rowe Decl., ¶¶ 2-3).  In his Declaration, Mr. Rowe avers that he understood that "none of the texting platforms, Twilio, Callfire, or 3Seventy, had the ability to confirm that a text message actually made it to the recipient's device, *i.e.,* whether it was "received." (*Id.*, ¶ 22; *see also* note 2, *supra*).  Rather, Mr. Rowe states that "[t]he platforms would only notify me that a text message was sent." (*Id.*, ¶23).  As to the ICO information upon which Plaintiff bases his Motion for Certification, an Excel Spreadsheet bates labeled "Mohamed-AMC000630 OLO_ALL_TEXTS.csv," Mr. Rowe states that he created the document "by downloading information from Twilio and importing the information into an Excel program." (*Id.*, ¶ 24).  Mr.

Rowe does not know how Twilio compiled its information.   (*Id.*).   Mr. Rowe explains the "document does <u>not</u> contain any information evidencing whether a text message was ***received*** or whether the alleged recipient "opened" the text message on his or her device or otherwise viewed the message."   (*Id.*) (emphasis added).   The importance of this point becomes even more apparent by the fact the Excel Spreadsheet contains phone numbers that are not cellular telephone numbers, but residential land lines, which cannot receive text messages, or "VOIP" numbers, which are not necessarily assigned to cell phones.   (Ex. H, Stafford Decl., ¶ 6). Removing these phone numbers from the putative class would only resolve one of Plaintiff's many problems, but does not solve for inadmissibility and unreliability of the central piece of evidence supporting Plaintiff's Motion.

Indeed, Plaintiff wishes this Court to simply *assume* that because the text messages were "sent" they must have been received, just a Plaintiff also wishes this Court to *assume* that merely the receipt of a text message all by itself creates a "concrete" injury, and to *assume* that such injury is the same injury Plaintiff claims to have suffered (*see* Section B, *infra*).  But, in addition to fact that many of these phone numbers are residential phone lines that do not receive texts, it is also common place for text messages to be blocked.[11]  Plaintiff, therefore, has not carried his burden of showing that common issues predominate.

Class certification in this case is also improper because the putative class includes members who could not have suffered a concrete injury under *Spokeo* – whether it is cost, nuisance, invasion of privacy, or inconvenience – unless the class member actually *received* a text message in question.  These individualized issues would not merely predominate, but would *overwhelm this case*, rendering this matter inappropriate for class certification. *See, e.g.,*

---

[11]    *See*    https://support.twilio.com/hc/en-us/articles/223181708-Can-my-Twilio-SMS-messages-be-blacklisted-as-spam-.

*Sandoval v. Pharmacare US,* Inc., Nos. 15-cv-0738, 15-cv-0120, 2016 WL 3554919 (S.D. Cal. Jun. 10, 2016) (citing *Spokeo* and stating that "[w]hether characterized as problems with overbreadth, commonality, typicality, or Article III standing . . . class certification is not proper to the extent that Plaintiffs raise claims and theories they do not have standing to raise, and to the extent that the class includes consumers who have no cognizable injury, including those who obtained full refunds").

C.    **PLAINTIFF'S CLAIM IS <u>NOT</u> TYPICAL OF THE OTHER CLASS MEMBERS.**

Class certification also requires that the claims of the class representatives be typical of those of the class.  *See* Fed. R. Civ. P.  23(a)(3).   To establish "typicality," there must be a "nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class."   *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir. 1984).  "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Id.*  When the class representative's injury is ***different*** from that of the rest of the class, his claim is not typical and he cannot serve as the class representative. *See Murray v. Auslander,* 244 F.3d 807, 811 (11th Cir. 2001). When proof of the class representative's claim would not necessarily prove the claims of the proposed class members, the class representative does not satisfy the typicality requirement.  *See Brooks v. S. Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 58 (S.D. Fla. 1990).

Plaintiff contends he was satisfied the "typicality" requirement because he and the putative class "were subjected to the same text message program, and their claims present the same legal theory."  (D.E. 111, Mot., p. 16).  Once again, Plaintiff adopts an extremely narrow view of this case and the issues presented on class certification.  The facts surrounding Plaintiff's

"live" text message exchanges with ICO, the content of Plaintiff's Craigslist ads, and Plaintiff's purported "injury" as a consequence of the alleged text messages are so unique as to render Plaintiff's claims atypical in at least three ways.

First, it is undisputed that before receiving the text messages he now complains of, Plaintiff was contacted by a "live" person from AMC in March 2014, who wished to make an offer on the used car Plaintiff had listed for sale. (Ex. A., Mohamed Dep., at 77:18-88:16).  Via text messaging, Plaintiff provided AMC with information regarding his vehicle for sale and AMC made Plaintiff an offer, which he rejected. (*Id.*, at 81:6-83:15, 85:10-86:6).  Following this text message conversation with ICO in March 2014, Plaintiff received the first of three e-mails he now complains of, on October 15, 2014, which asked Plaintiff if the car he had listed in March was "still available." (*Id.* at 86:7-10).  Plaintiff concedes that this email was likely sent by a "live" person and not an automated telephone dialing system. (*Id.* at 86:11-87:1).

Plaintiff's extended relationship with ICO implicates issues concerning the revocation of consent.  In response to an October 10th text message, Plaintiff exclaimed:  "Kiss my a$$." (*Id.* at 87:2-17).  ICO responded with instructions to "opt out" by texting "STOP" in capital letters. (*Id.* at 87:18-25).  Plaintiff, however, replied by texting "stop" in lower case letters. (Id. at 87:23-25).  Furthermore, after texting "stop," Plaintiff admitted to listing additional cars for sale on Craigslist, whereupon, after presumably "scraping" Plaintiff's telephone number from those ads once again, ICO sent the next two text messages that Plaintiff complains of in this action, on January 16, 2015, and April 9, 2015. (*Id.*at 88:17-22).

Clearly, Plaintiff engaged in a back-and-forth exchange with AMC regarding his used car listed for sale, consenting to the communication.  Thereafter, the first of three text messages Plaintiff complains of constituted a "follow-up" text inquiring about that same car, which

Plaintiff acknowledges was likely not from an ATDS and therefore, not actionable under the TCPA.  Plaintiff then attempted to revoke his consent, by texting "stop" (albeit incorrectly), and continued to advertise his cars for sale online and invite third parties to respond, all of which raises unique factual and legal issues distinct and separate from the putative class.

Second, as discussed above, Plaintiff alleges that his Craigslist ads included phrases such as "please don't text me" or "please be serious before calling."  (D.E. 20, First Am. Compl., ¶ 28).  We now know that assertion is less than accurate, as many of Plaintiff's Craigslist ads do not contain any "no texting" limiting language.  (Ex. G, Plaintiff's Craigslist ads).   Aside from whether Plaintiff's limiting language was universally used, on the crucial question of whether Plaintiff's claim is typical of those of the class he purports to represent, the record evidence discussed previously shows that of approximately 880 Craigslist ads from which phone numbers were purportedly "scraped" and sent a text message by ICO, only ten ads explicitly state "do not text me" or included similar language employed by Plaintiff in some of his ads.  (Ex. H, Stafford Decl., ¶ 14).  To the contrary, and undermining Plaintiff's position, *more than 20 times* as many people expressly stated "please text," "text ok," or something similar in their Craigslist ads. (*Id.*).  Put simply, Plaintiff's admonition against texting is anything but typical of other members of the putative class.[12]

Third, Plaintiff's allegation that he and the putative class "were subjected to the same text message program" in violation of the TCPA is insufficient to satisfy the typicality requirement.

---

[12] In his deposition, Plaintiff testified that included this language because "I need glasses to see and the buttons on the phones are really small so it's hard for me to text . . . [a]nd I hate texting." (Ex. A, Mohamed Dep. at 38:20-25).  As such, Plaintiff's whole approach to text messaging  is entirely different from the claims of putative class members, who did not include such language in their ads or who, in fact, might actually prefer to be texted.  A 2014 Gallup survey determined that sending and receiving text messages outranked phone calls as the most prevalent form of communication for Americans younger than 50. http://www.gallup.com/poll/179288/new-era-communication-americans.aspx

Post-*Spokeo*, Plaintiff must do more that allege a "bare procedural violation," and demonstrate a concrete harm.  In his Brief on Standing, Plaintiff identified as harms "invasion of privacy, intrusion upon his cellular phone, waste of time, and nuisance."  (D.E. 175, Brief, p. 5).  Plaintiff has not presented *any* evidence, and therefore has failed to carry his burden under Rule 23(a)(3), of demonstrating that the harms he allegedly suffered are typical of the putative class members.

**D.     DISPROPORTIONATE DAMAGES WEIGH AGAINST A FINDING OF SUPERIORITY UNDER RULE 23(B)(3).**

Rule 23(b)(3) requires that the putative class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Several courts have emphasized fairness and due process concerns as part of the "superiority" analysis, and have denied class certification when statutory damages are disproportionate to the actual harm suffered by the members of the putative class.  *See, e.g., Klay,* 382 F.2d at 1271 (noting in dicta that "courts take a harder look" in cases where "the potential damages available in a class action are grossly disproportionate to the conduct at issue"); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, n.5 (11th Cir. 2003) (class action device may not be superior method of adjudicating controversy where case involves technical violations of a "complex regulatory scheme, subject to different reasonable interpretations" and "defendants' potential liability would be enormous and completely out of proportion to any harm suffered by plaintiff"); *Leysoto v. Mama Mia I, Inc.,* 255 F.R.D. 693, 699 (S.D. Fla. 2009) (denying motion to certify class action because "to grant the requested class relief would allow this Plaintiff, and his counsel, to dangle the Sword of Damocles over Defendant, without any showing of actual economic harm").  *See also Wilcox v. Commerce Bank of Kansas City,* 474 F.2d 336, 347 (10th Cir.1973) (concluding that class certification of TILA claim was inferior "where the complaint contains no indication of any actual damages in substantial or provable amount" and "aggregated relief would be oppressive in

consequence and difficult to justify");.

In the case of *Ehren v. Moon, Inc.*, No. 09-21222-CIV, 2010 WL 5014712, at *9-10 (S.D. Fla. Dec. 3, 2010), this Court denied class certification of a Fair Credit and Accurate Credit Transactions Act claim where the complaint contained no indication of any actual damages, and the aggregated relief could be "annihilative" and oppressive," and "could raise serious constitutional problems implicating the Defendant's Due Process rights." Similarly, in this case, there is <u>no</u> evidence that Plaintiff, or any other putative class members, suffered any *actual* injury arising from ICO's text messaging. On the other hand, based on Plaintiff's Motion for Summary Judgment, Plaintiff and the putative class members are seeking, at a minimum, statutory damages of $500 per text message for ICO's 78,176 text messages, or the sum of $39,088,000.00 in damages. This does not include Plaintiff's claim for treble damages, which would raise the damages to $117,264,000.00; sums that would certainly bankrupt Off Lease. Moreover, damages of this magnitude are significantly disproportionate to the harm caused – *if any* – by text messages sent by ICO (and not Off Lease) that merely offered to purchase cars the recipients listed for sale in Craigslist ads; all of which is premised solely on a theory of vicarious liability for of ICO's actions. An award of damages in such an amount is exceptionally disproportionate and unreasonable. In light of Rule 23(b)(3)'s directive to "fairly" adjudicate the controversy and the case law discussed above, this case is inappropriate for class certification.

**E.      THE PROPOSED CLASS IS <u>NOT</u> READILY ASCERTAINABLE.**

Last, in addition to the requirements of Rule 23(a), the proponent of the class must also establish that the proposed class is "adequately defined and clearly ascertainable." *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 684 (S.D. Fla. 2014). The issue of "ascertainability" relates to whether the putative class can be identified by reference to "objective criteria." *See id.* These

"objective criteria" should be "administratively feasible," meaning that the identification of class members should be "'a manageable process that does not require much, if any, individual inquiries.'" *Id.*  Here, there are at least <u>two</u> significant obstacles to ascertainability of the class.

### 1.      *Class membership cannot be determined without resort to "mini-trials."*

The proposed class definition of all persons who "received" text messages cannot be determined by the records Plaintiff depends upon and instead, would require individualized inquiries or "mini-trials" making the class administratively infeasible.  Again, Plaintiff bases class membership on the Excel Spreadsheet produced by ICO, which only contains the cellular telephone number to which the text message was *sent*.  (D.E. 213, Mot., p. 29).  Without competent evidence showing the phone numbers for each text message was ***actually "received,"*** the Court would be required to conduct a "mini-trial" for each and every class member to determine whether, in fact, that particular individual "received" a text message.  Each class member would need to present evidence proving that he or she a) was the subscriber at the moment in question and b) that the subscriber actually received a text message.  Not only that, the Court would need to then determine, among other things, whether the text message qualified as one of those that is the subject matter of this action, was sent by ICO on behalf of OLO during the time period relevant to this action, and, most important, make authenticity and credibility determinations to prevent fraudulent claims.  Accordingly, simply to determine member of the proposed class would require individualized determinations of disputed fact, an administrative nightmare and patently not readily ascertainable.

### 2.      *The proposed class definition represents an improper "fail-safe" class.*

In proposing a putative class of individuals who placed advertisements online for the sale of a used car and who received a text message from ICO expressing its intent to make an offer to

buy the advertised vehicle, Plaintiff contends that "[a]ll of the text messages were sent using an automated telephone dialing system, and *none were sent with the prior express consent of the recipient*."   (D.E. 213, Mot., pp. 2) (emphasis added).   This proposed class definition is fundamentally improper because it requires the Court to make an inappropriate determination of the merits of the case at the class certification stage.  *See Perez v. Metabolife Int'l, Inc.,* 218 F.R.D. 262, 268 (S.D. Fla. 2003) (class definition suffers "from the fundamental problem that the Court may not inquire into the . . . merits of a case at the class certification stage).

For the Court to determine, as Plaintiff maintains, that the text messages were sent <u>without</u> the prior express consent of the recipient, the Court would be required to make a determination on one of the ultimate issues of liability in this case.  As mentioned above, in light of the importance the Court has placed on the language used in the text recipient's Craigslist ads, before determining membership in the proposed class, the Court will need to determine, as a matter of law, whether it will only accept the explicit statement "do not text me" as an expression that the advertiser did not provide consent to be contacted or whether some other language would also be appropriate.  The Court will also need to determine, as a matter of law, whether Craigslist advertisers who did <u>not</u> include any limiting language (or who expressly stated "please text me") provided their consent to be contacted.  Because determining class membership would require the Court to decide the issue of consent in favor of Plaintiff and the putative class, the proposed class definition is unascertainable.  For this reason as well, certification should be denied.[13]

---

[13] *See, e.g., Espejo,* 2016  WL 6037625, at *8 (impermissible "fail-safe" class because class membership would require "a determination of consent");  *Lindsay Transmission, LLC v. Office Depot, Inc.,* No. 4:12-cv-221, 2013 WL 275568, at *4 (E.D. Mo. Jan. 24, 2013) (striking class allegations where proposed TCPA class definition "requires addressing the central issue of liability to be decided in the case"); *G.M. Sign, Inc. v. Franklin Bank SSB*, No. 06 C 949, 2007 WL 4365350, at *3 (N.D. Ill. Dec. 13, 2007) (denying class certification, in part, because "the proposed class definition improperly includes a component of a lack of defense, namely proof of express permission or invitation prior to the receipt of the fax advertisement").

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that on April 21, 2017, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will serve a copy of the document on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   /s/ Franklin Zemel_____
Franklin L. Zemel
Florida Bar No. 816620
ARNSTEIN& LEHR LLP
*Counsel for Off Lease Only*
200 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, Florida 33301
Tel:  (954) 713-7600
Franklin.Zemel@arnstein.com

## SERVICE LIST

**Mohamed v. American Motor Company, et al.,**
**United States District Court for the Southern District of Florida**
**Case No. 15-cv-23352-MGC**

| | |
|---|---|
| Scott D. Owens, Esq.<br>Patrick C. Crotty, Esq.<br>Sean M. Holas, Esq.<br>SCOTT D. OWENS, P.A.<br>664 E. Hallandale Beach Blvd.<br>Hallandale, FL 33009<br>Email: scott@scottdowens.com<br>Email: patrick@scottdowens.com<br><br>Brett L. Lusskin, Jr., Esq.<br>LAW OFFICE OF BRET LUSSKIN, ESQ.<br>20803 Biscayne Blvd., Suite 302<br>Aventura, FL 33180<br>Tel: (954) 454-5841<br>Email: blusskin@lusskinlaw.com<br><br>Manuel Santiago Hiraldo, Esq.<br>HIRALDO P.A.<br>401 E. Las Olas Blvd. Ste 1400<br>Fort Lauderdale, FL 33394<br>Tel: 954-400-4713<br>Email: mhiraldo@hiraldolaw.com<br><br>Seth Michael Lehrman, Esq.<br>Steven R. Jaffe, Esq.<br>FARMER, JAFFE, WEISSING,<br>EDWARDS, FISTOS & LEHRMAN, P.L.<br>425 N. Andrews Ave., Suite 2<br>Fort Lauderdale, FL 33301<br>Tel: 954-524-2820<br>Email: seth@pathtojustice.com<br>Email: steve@pathtojustice.com<br><br>*Attorneys for Plaintiff Ray Mohamed* | Franklin L. Zemel, Esq.<br>Alan R. Poppe, Esq.<br>ARNSTEIN & LEHR LLP<br>200 East Las Olas Boulevard, Suite 1700<br>Fort Lauderdale, Florida 33301<br>Tel: (954) 713.7600<br>Fax: (954) 713-7710<br>Email: franklin.zemel@arnstein.com<br>Email: apoppe@arnstein.com<br><br>*Attorneys for Defendant Off Lease Only, Inc.*<br><br>Ejola Cook, Esq.<br>Rebecca Radosevich, Esq.<br>OFF LEASE ONLY, INC.<br>776 Lake Worth Blvd.<br>Lake Worth, Florida 33460<br>Tel: (561) 222-2277<br>Fax: (561) 223-2817<br>Email: court@offleaseonly.com<br>    ejolac@offleaseonly.com<br><br>*Attorneys for Defendant Off Lease Only, Inc.*<br><br>Richard Epstein, Esq.<br>Jeffrey A. Backman, Esq.<br>GREENSPOON MARDER, P.A.<br>200 East Broward Blvd., Suite 1800<br>Fort Lauderdale, FL 33301<br>Tel: (954) 491-1120<br>Fax: (954) 213-0140<br>Email: Richard.Epstein@gmlaw.com<br>Email: Jeffrey.Backman@gmlaw.com<br><br>*Attorneys for Defendant American Motor Company, LLC* |